## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| **YOLANDA HERNANDEZ,**<br>**Plaintiff**<br><br>**v.**<br><br>**SMITH KLINE BEECHAM**<br>**PHARMACEUTICAL, et al.,**<br>**Defendants** | **Civil No. 02-2750 (DRD)** |

### MAGISTRATE-JUDGE'S REPORT AND RECOMMENDATION

Plaintiff, Yolanda Hernández-Rodríguez (hereafter "Hernández") filed a complaint on December 2, 2002, alleging violations of the Americans with Disabilities Act, 42 U.S.C. §12101, *et seq.* (hereafter "ADA"), and Title VII of the Civil Rights Act of 1963, 42 U.S.C. § 2000e *et seq.* and the Civil Rights Act of 1991, 42 U.S.C. § 1981a, as well as supplemental state claims **(Docket No. 1)**. Hernández was employed by Defendant Smith Kline Beecham Pharmaceutical. She alleges that she has a qualifying disability under the ADA, requested a reasonable accommodation, and that rather than providing her with the same, she was terminated on November 21, 2000, in violation of the ADA. Plaintiff further alleges that she was subjected to a hostile work environment in violation of Title VII and that she suffered a nervous breakdown due to said environment.

Defendants Glaxo SmithKline (hereafter "SmithKline") and José Ramón Rivera move for summary judgment **(Docket Nos. 26, 27, 30)**. Hernández opposed the motion, however, her opposition was stricken by the Court as it was not timely filed **(Docket Nos. 33, 34, 35, 36, 42)**. Accordingly the motion for summary judgment is considered

unopposed.  The Motion for Summary Judgment was referred to the undersigned for report and recommendation on June 10, 2005, **(Docket No. 48)**.

**Factual Background**

The following facts are undisputed[1].  On January 8, 1979, Hernández began working for SmithKline in Carolina, Puerto Rico on a temporary basis as a pharmaceutical operator.  In 1985 she was transferred to the SmithKline facility in Cidra and in 1989 she began working as a security officer at the facility.  Her supervisor was José Ramón Rivera (hereafter "Rivera").

In 1990 Hernández was hospitalized due to clinical depression. Her physician recommended that she not work in an isolated environment and that she work an eight-hour shift during the day. SmithKline transferred Hernández to the lobby of the SmithKline facility in Cidra where she could work with people during regular (i.e. daylight) work hours.  In 1993, Hernández suffered a mental crisis and attempted suicide at her security post by ingesting a large dose of pills. She was granted a medical leave that lasted from six to seven months. Following her return to work, Hernández continued to work as a Security Officer in the lobby of SmithKline's Cidra facility until the year 2000 when her employment was terminated.  She worked a straight 8:00 AM to 4:30 PM shift, rather than the usual rotating shift. Hernández's supervisors never changed her straight shift or her job duties, and  was kept on this modified schedule until the day she left

---

[1]Inasmuch as these facts are taken directly from the Defendants' Statement of Uncontested Facts found at Docket No. 26, it is unnecessary to provide a cite for each specific fact.  Citations are set forth only when not taken from the Defendants' Statement of Uncontested Facts.

her employ. *Hernández dep. p. 242.*

On October 18, 2000, an incident occurred at SmithKline's lobby security post involving a discussion between Hernández and one of her coworkers, Ana Castrodad. As a result, the next day, October 19, 2000, Hernández was called to a meeting by Rivera, her supervisor. Hernández, Rivera and Luisa Cartagena (hereafter ''Cartagena''), a Human Resources Officer at SmithKline, were present at the meeting. When Hernández was informed that the meeting had to do with the previous day's disruptive behavior and her behavior in general, she stood up, lost control and began shouting, accusing and physically threatening her supervisors, including pointing her finger at Cartagena and Rivera. Hernández abruptly and unilaterally ended the meeting and left for SmithKline's infirmary. At the infirmary Hernández was attended to by Dr. Carlos Robles (hereafter ''Dr. Robles''), the company physician. There she was sedated due to her emotional condition. At that time Hernández expressed desire and willingness to kill Rivera and Cartagena. Dr. Robles testified during his deposition that on that day Hernández had an ''emotional crisis''. *Robles dep. p. 42.*

Subsequently, Raul Cermeño, former Director of the Finance Department at SmithKline and Sonia Berrios (hereafter ''Berrios''), former Human Resources Manager at SmithKline, discussed the incident, reviewed related documents, Hernández's work history and behavior and made the decision to terminate her employment. Prior to summoning Hernández back to SmithKline's facilities to discuss her termination, Dr. Robles requested a medical certificate from Hernández certifying that she was fit to return to work in order to assure both her and SmithKline's safety.

On November 3, 2000, while off work, Hernández filed with the Anti-Discrimination Unit of Puerto Rico, Department of Labor and Human Resources,   a charge of discrimination under Title VII for alleged sexual harassment.

Hernández submitted a medical certificate from Dr. Efraín del Valle, dated November 8, 2000, indicating a rest period from October 23, 2000 to November 15, 2000.  The certificate states that Hernández has recurrent severe major depression without psychotic features. *Def.'s Ex. 10.*  It further indicated that Hernández had visited Dr. del Valle on May 4, June 13, October 20, 21, 24, 28 and November 1, 2000. *Id.* Her treatment consisted of being prescribed the medications Effexor and Doxepin and psychotherapy.  *Id.*  The doctor commented that Hernández had severe depressive signs and symptoms for which she needed continuous therapy that would result in the benefit
of their remission.  *Id*.  Also, the certificate stated that at the time she was fit to work in her regular functions on a daily work shift,  since she presented difficulty in her sleep pattern.  *Id.*

SmithKline has established rules of conduct in the workplace that indicate an associate's employment will be terminated if on the company's premises, he or she threatens and/or insults another associate. Hernández acknowledged receipt of the Revised Information Manual for Associates that sets forth the rules of conduct at the SmithKline Cidra facility.  She had acknowledged receipt by her signature on June 21, 1998.  On November 21, 2000, Berrios met with Hernández and informed her of SmithKline's decision to terminate her employment due to serious violations of SmithKline's policies, her inappropriate behavior towards her coworkers, insubordinate and the

threatening behavior of October 19, 2000.

Hernández then amended her Anti-Discrimination charge on November 22, 2000, to add that her employment at SmithKline had been terminated.  One month later, on December 21, 2000, Hernández filed a charge of disability discrimination under the ADA.  Following her employment at SmithKline, Hernández worked on a temporary basis for Kelly Services as a packaging operator and manufacturing operator.  She also worked as a Purchasing Agent at Mi Casita, a job she left as soon as Kelly Services called her to perform other temporary work.

Hernández's emotional condition is under control when she takes medication.  She testified that she takes her medication on a daily basis and that when she is medicated her condition is stable and under control. *Hernández. dep. p. 236.* She also testified that when she is medicated she can perform her  daily tasks normally and can also perform her work fully. *Id*. at p. 237.  Also, when she is medicated she can perform completely in her private and family life without any type of limitation. *Id.*  Her problems arise when she is unable to take her medication on the schedule that her physician has ordered her to take it.  *Id.*  at 238.  Plaintiff asserts that if she follows the medication schedule, she functions perfectly.  *Id.*  SmithKline adjusted Hernández's work schedule because of her medication schedule and also adjusted certain duties assigned.  *Id.* at p. 239-40.  This occurred in 1992 or 1993. *Id*. at p. 240.

Hernández also testified that she does not sleep well and it is necessary for her to take medication to help her sleep.  *Hernández dep. pp. 25-26.* She normally takes Doxepin to sleep.  *Id.* at p. 26.

Hernández also makes a claim of sexual harassment. Hernández's sexual harassment complaint is premised on the following incidents all of which allegedly occurred in the year 2000:   1)   Rivera began supervising Hernández in January or February of 2000.  *Hernández dep at p. 135.*  2) Rivera's alleged remark that Hernández, like Ana Castrodad, should wear a miniskirt to show her legs; 3) in October 2000 Rivera sat on Ana Roble's legs; 4) during the beginning of the year 2000, Rivera's alleged remark to Hernández that Ana Castrodad was nice looking;  5) Rivera's alleged remark to Hernández that Grisselle Guevara was pretty and that what he had at home was worthless; and 6) Rivera's alleged remark to Hernández that Betsy Rodríguez had obtained her position in the company because of the relationship she had with José Luis Rosado, former President of SmithKline. Hernández also alleges other incidents of sexual harassment that allegedly occurred sometime between 1985 and 1999.

Toward the end of May, 2000, Hernández approached Cartagena to speak to her about feeling uncomfortable about how Rivera treated her.  *Id.* at pp. 137-38.    She testified that Rivera and Castrodad's attitude were affecting her work. *Id*. at p. 139.  Hernández testified that she tried to speak to Cartagena, but was unable to.  *Id*.  She stated that Cartagena cut her off.  *Id.* at p. 159.  Cartagena testified that she had no knowledge and was not informed of any of the incidents that allegedly occurred in 2000.  *Cartagena dep. pp. 65-70.*

SmithKline has established policies designed to prevent discriminatory conduct and sexual harassment in the workplace. Hernández acknowledged during her deposition that SmithKline has a policy to deal with sexual harassment that included a grievance

procedure.  *Hernández dep. p. 46.*   The policies provide a complaint mechanism for employees.  Employees who believe that they are being harassed are required to inform SmithKline's Equal Opportunities Coordinator or Employee Advisor.  If the harasser is one of these two individuals, or is related and/or has a close friendship with any of these two individuals, the employee must inform SmithKline's President or the General Manager.  Hernández was aware of SmithKline's sexual harassment policies and complaint mechanism, but she did not use them.

**I.     Analysis**

Defendants SmithKline and José Ramón Rivera   move for summary judgment on the basis that there is no genuine issue of material fact that requires resolution and they are entitled to judgment as a matter of law.

**A.     Legal Standard**

Summary judgment is appropriate when the evidence before the court shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c)." *Seaboard Sur. Co. v. Greenfield Middle Sch. Bldg. Comm.,* 370 F.3d 215, 218 (1st Cir. 2004).   When ruling on a motion of summary judgment, the court "must scrutinize the evidence in the light most agreeable to the nonmoving party, giving that party the benefit of any and all reasonable inferences. *Cox v. Hainey,* 391 F.3d 25, 27 (1st Cir. 2004).   While carrying out that task, the Court safely can ignore "conclusory allegations, improbable inferences, and unsupported speculation." *Suárez v. Pueblo Int'l, Inc.*, 229 F.3d 49, 53 (1st Cir. 2000) (quoting  *Medina-Muñoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir.

1990)).

An issue is "genuine" for purposes of summary judgment if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and a "material

fact" is one which "might affect the outcome of the suit under the governing law." *Hayes v. Douglas Dynamics, Inc.,* 8 F.3d 88, 90 (1st Cir. 1993) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)).

It is also well settled that the nonmovant bears "the burden of producing specific facts sufficient to deflect the swing of the summary judgment scythe." *Mulvihill v. Top-Flite Golf Co.,* 335 F.3d 15, 19 (1st Cir. 2003). Those facts, typically set forth in affidavits, depositions, and the like, must have evidentiary value; since as a rule, "[e]vidence that is inadmissible at trial, such as inadmissible hearsay, may not be considered on summary judgment." *Vásquez v. López-Rosario,* 134 F.3d 28, 33 (1st Cir. 1998). Finally, it is well settled that "[t]he mere existence of a scintilla of evidence" is insufficient to defeat a properly supported motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 252.

### A.     Individual Liability

Defendants argue that Rivera cannot be held individually liable under either Title VII or the ADA for the claims brought against him by Hernández and as a result said claims should be dismissed for failure to state a claim upon which relief may be granted. The undersigned agrees.

As noted time and time again in this district, neither the First Circuit Court of Appeals nor the U.S. Supreme Court has decided whether individual/personal liability attaches to agents or supervisors

under Title VII, the Americans with Disabilities Act (ADA), the Age Discrimination in Employment Act (ADEA) or the Rehabilitation Act. *Figueroa-Garay v. Municipality of Rio Grande*, 364 F.Supp.2d 117, 130 (D.P.R. 2005); *Castro-Ortíz v. Fajardo,* 133 F.Supp.2d 143, 150 (D.P.R. 2001). Nonetheless, this District continues to follow the majority of federal circuit courts of appeals in holding that no such personal liability may be imposed. *Castro- Ortíz v. Fajardo,* 133 F.Supp.2d at 150-51 (string citations omitted).   The undersigned is not inclined to disregard the precedent of this District.

   **Accordingly, it is RECOMMENDED that Defendants' request for dismissal of Plaintiff's ADA and Title VII claims against defendant Rivera in his individual capacity be GRANTED, and the claims brought against him be DISMISSED with prejudice.**

   **A.      The American with Disabilities Act**

   The ADA prohibits certain types of discrimination in the workplace against an otherwise qualified individual with a disability. 42 U.S.C. §§ 12101 *et seq.* To establish a *prima facie* case of disability discrimination, under the ADA statutory-framework method, Hernández must prove by a preponderance of the evidence: (1) that she is disabled within the meaning of the ADA; (2) that she is able to perform the essential functions of her job, with or without reasonable accommodation; and (3) that the adverse employment decision was based in whole or in part on

her disability. *Phelps v. Optima Health Inc.,* 251 F.3d 21, 24 (1st Cir. 2001); *Marcano-Rivera v. Pueblo Int'l,* 232 F.3d 245, 251 (1st Cir. 2000); *García-Ayala v. Lederle Parenterals, Inc.,* 212 F.3d 638, 646 (1st Cir. 2000).

   Absent direct evidence that the defendants harbored a discriminatory animus in taking an employment action, the plaintiff

must turn to the burden-shifting model established in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802-05 (1973); *Sánchez v. Western Auto of Puerto Rico,* 68 F.Supp.2d 93, 98 (D.P.R. 1999). Under this framework, a plaintiff must first prove, by a preponderance of the evidence, that she "(i) has a disability within the meaning of the Act; (ii) is qualified to perform the essential functions of the job, with or without reasonable accommodations; (iii) was subject to an adverse employment action by a company subject to the Act; (iv) was replaced by a non-disabled person or was treated less favorably than non-disabled employees; and (v) suffered damages as a result." *Jacques v. Clean-Up Group.,* 96 F.3d 506, 511 (1st Cir. 1996). Upon this showing, the burden shifts to the employer to "articulate some legitimate, nondiscriminatory reason for the employee's rejection." *McDonnell,* 411 U.S. at 802; *Cumpiano v. Banco Santander P.R.,* 902 F.2d 148, 153 (1st Cir. 1990). The employer's burden is merely one of production; the plaintiff retains the burden of persuasion at all times. *Mesnick v. General Elec. Co.,* 950 F.2d 816, 823 (1st Cir. 1991). Once the employer has met the burden of production, the ultimate burden falls on plaintiff to show that the proffered legitimate reason is pretextual and that the adverse employment action resulted from the employer's discriminatory animus. *Bishop v. Bell Atl. Corp.,* 299 F.3d 53 (1st Cir. 2002). It must always be kept in mind that in a disability discrimination case, the plaintiff must establish the crucial element that she is disabled within the meaning of the Act. *See Cruz v. McAllister Bros., Inc.,* 52 F.Supp.2d 269, 279 (D.P.R.1999) (citing *Arnold v. United Parcel Serv., Inc.,* 136 F.3d 854, 856-59 (1st Cir. 1998)).

The defendants argue that Hernández is not a qualified individual under the ADA. In the alternative, they argue that should the Court

determine that Hernández is a qualified individual the uncontested facts are that she could not perform the essential functions of her job with or without accommodation and that they complied with any obligation they had to provide a reasonable accommodation.

　　　1.　　　**Disability**

　　　The term "disability" refers to a condition that has "substantially limited" a "major life activity."  29 C.F.R. § 1630.2; *Tardie v. Rehabilitation Hosp.*, 168 F.3d 538 (1st Cir. 1999).  In order for the plaintiff to meet the first element of a *prima facie* case that she had a "disability" within the meaning of the ADA, Hernández has the burden of showing that she (a) has a physical or mental impairment that substantially limits one or more of her major life activities;  (b) has a record of such an impairment;  or (c) is regarded as having such an impairment. *See* 42 U.S.C. § 12102(2);  *Calero-Cerezo v. United States Dep't of Justice,* 355 F.3d 6,  20 (1st Cir. 2004).

　　　To prove disability under the first prong, it must first be determined whether the plaintiff has a physical or mental impairment, and then whether the same substantially limits her ability to engage in major life activities. *See Santiago-Clemente v. Executive Airlines*, 7 F.Supp.2d 114, 117 (D.P.R.1998); *see also Rodríguez v. Loctite P.R. Inc.*, 967 F.Supp. 653, 659 (D.P.R.1997) ("An illness cannot in and of itself be considered an impairment. Only its symptoms and/or ramifications actually limit the inflicted person's ability to perform major life activities.").  The determination of whether an impairment substantially limits one or more of an individual's major life activities is guided by a three-step analysis considering whether: (1) the problem constitutes a physical impairment;  (2) the life activities upon which plaintiff relies constitute

major life activities under the ADA;  and (3) the impairment substantially limited one or more of the major life activities. *Santiago-Clemente,* 213 F.3d at 30 (citing *Bragdon v. Abbott,* 524 U.S. 624, 631 (1998)).

 Reading the record in the light most favorable to Hernández, she satisfies the first step of this analysis.  It is undisputed in the record that Hernández suffers from recurrent severe major depression. The First Circuit has recognized depression as a mental impairment that may constitute, at least in some circumstances, a disability under federal law. *Calero-Cerezo,* 355 F.3d at 20 (citing  *See Criado v. IBM Corp.,* 145 F.3d 437, 442 (1st Cir. 1998).  The Seventh, Ninth, Eleventh and Fifth Circuits have also recognized depression as a qualifying mental impairment. *Id.* (string citations omitted).

The record also provides ample evidence to conclude that Hernández suffered from major depression during the relevant period. After the incidents in late October 2000, Hernández was off work for approximately two weeks, following what the company doctor called an "emotional crisis".  Also, the record reflects that Hernández has been consistently treated for depression since at least 1990 when she was hospitalized for clinical depression.  **Based upon the law and the facts it is apparent that she suffers from a qualified mental impairment.**

The undersigned now turns to the issue of whether Hernández's mental impairment limits a "major life activity".  In this regard, the Defendants argue that Hernández has not submitted evidence as to how her impairment substantially limits a major life activity.  The undersigned takes note that while the Complaint alleges that Hernández has a qualifying disability (i.e. major clinical depression), it contains no allegations of how her disability substantially limits any

major life activity.  This alone, suffices for a finding that **Hernández has not met her burden to show she is an individual with a disability within the meaning of the ADA**. Regardless, the Court will address the issue.

Major life activities are only those that are of central importance to daily life.  *Toyota Motor Mfg. v. Williams*, 534 U.S. 184, 197 (2002).  Major life activities are defined as those "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." 29 C.F.R. §. 1630.2; *Gelabert-Ladenheim v. American Airlines, Inc.*, 252 F.3d 54, 58 (1st Cir. 2001).  Also, sleeping has been recognized as a major life activity.  *See Criado v. IBM Corp.,* 145 F.3d 437, 442-43 (1st Cir.1998) (stating that sleeping is a major life activity).

In the case at bar, two major life activities appear to be at issue: working and sleeping.  Defendants, taking a cautious approach and construing the complaint liberally, address the issue of whether plaintiff is substantially limited in the major life activity of work. The Defendants asserts that Hernández cannot show that she had a disability that substantially limited major life activities, and that she is not limited in the major life activity of working. Additionally, on record we have the medical certificate issued by  Dr. del Valle which indicates that Hernández is to work a day shift since she "presents difficulty in her sleep pattern."  Other than this, the record is bereft of mention of any limits of a major life activity.

To meet her burden, Hernández must show that her impairment "substantially limited" the performance of the claimed major life activity. Whether an individual's alleged disability substantially limits one or more of her major life activities is evaluated on a case by case

basis. *See* 29 U.S.C. § 706(2). The fact of merely having an impairment does not make one disabled for purposes of the ADA. *Toyota Motor*, 534 U.S. at 195. Therefore, not only must the impairment affect a major life activity, but it must also substantially limit it. In particular, being substantially limited refers to being "(i) unable to perform a major life activity that the average person in the general population can perform; or (ii) significantly restricted as to the condition, manner, or duration under which an individual can perform that same major life activity." 29 C.F.R. § 1630.2(j)(1). Other factors considered are: the nature and severity of the impairment, the length of time which the impairment is expected to continue, and whether or not the impairment can be characterized as a long-term condition. *See* 29 C.F.R. § 1630.2(j)(2); *see also, Katz v. City Metal Co., Inc.*, 87 F.3d 26, 31 (1st Cir. 1996).

The First Circuit Court of Appeals assumes that "working" is a major life activity. *Guzmán-Rosario v. United Parcel Serv., Inc.*, 397 F.3d 6 (1st Cir. 2005). *e.g., Sullivan v. Neiman Marcus Group, Inc.*, 358 F.3d 110, 115-16 (1st Cir. 2004). EEOC regulations state that a plaintiff is "disabled" even if she can still work but if she is significantly restricted in or precluded from performing either a "class" of jobs--a set of jobs utilizing similar skills, knowledge, and training to her prior job--or a "broad range" of jobs in various classes--a large set of jobs that vary in what skills are required. *See Gelabert,* 252 F.3d at 60 (quoting 29 C.F.R. §§ 1630.2(j)(3)(ii)- (iii)). When looking at work as a major life activity, the First Circuit Appellate Court requires claimants to show that they are precluded from more than the performance of a particular job. *Guzmán-Rosario,*, 397 F.3d at 11 (citations omitted).

Plaintiff's deposition testimony does not support a finding of

substantial limitation in working. To the extent depression was an impairment, the Court is required to take into account Hernández's "ability to compensate for the impairment". *Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555, 565 (1999). Hernández's own testimony is that her condition is controlled when she takes medication, and that when she is medicated she can perform her daily tasks normally and can perform her work fully. Additionally, the record reflects that following her termination from SmithKline, Hernández worked as a packaging operator, manufacturing operator and as a purchasing agent. This evidence works against any showing of a qualified individual under the ADA as a result of being precluded from working a class or broad range of jobs. *See Santiago-Clement*, 213 F.3d at 31-32. Accordingly, it is concluded that **Hernández has not met her burden of showing a substantial limitation in working.**

**The record also does not support either a finding of substantial limitation in sleeping.** EEOC regulations state that an individual's significant restriction must be "compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." 29 C.F.R. § 1630.2(j)(2). Hence, Hernández must show that her difficulty in sleeping is worse than that quality of sleep of the general population. *See E.E.O.C. v. Sara Lee Corp.,* 237 F.3d 349, 352 (4th Cir. 2001) (citing *Pack v. Kmart Corp.,* 166 F.3d 1300, 1306 (10th Cir. 1999)); *Colwell v. Suffolk Co. Police Dept.,* 158 F.3d 635 (2nd Cir. 1998). Accordingly, Hernández must do more than merely assert she had difficulty sleeping.

The record merely reflects that Hernández takes medication to sleep and that she presents difficulty in her sleep pattern. There is no indication of how her sleep is limited or whether she gets less sleep

than the average person.  *See e.g. Felix v. N.Y. City Transit Auth.,* 154 F.Supp.2d 640 (D.N.Y. 2001) (plaintiff with a sleep disturbance lasting eight months and with well-documented records showing that the plaintiff obtained one to four hours of sleep per night, was found to have a profound sleep disturbance that rises well above the sleeping difficulties experienced by the general population); *Knorr v. Pepsico Food Services, Inc.,* 1999 WL 200685 (D.N.Y. 1999) (plaintiff set forth sufficient evidence establishing a substantial limitation on her ability to sleep where she showed that the average person gets five to eight hours of sleep per night and she only obtained one to one and a half hours per night).   More so, although Hernández established that she suffered from an inability to sleep, she does so only in general terms stating that she had difficulty sleeping and needed to take medication to alleviate the condition.  *Colwell,* 158 F.3d at 644 (stating that plaintiff's "descriptions of his limitations are marked throughout by hedging and a studied vagueness, so that there is no support for the idea that his impairments would be significantly limiting to 'the average person in the general population'" and in regard to "sleeping," finding insufficient plaintiff's assertion that he had to take sleeping pills and usually had a tough night's sleep.)   Hernández did not  describe her inability to sleep beyond generalities nor did she compare her inability to sleep with that of the average population.  As a result she has not provided evidence to support a reasonable conclusion that she was significantly restricted in her ability to sleep.

Based on the foregoing analysis, **Hernández has not established that she has a disability as the term is defined by the ADA and accordingly, she is not protected by the coverage of the ADA**.

### 1.    Qualified to Perform Essential Functions of the Job

Alternatively, the Defendants argue that if the Court determines that Hernández is considered disabled, she is not otherwise a "qualified individual" because with or without accommodation, she cannot perform the essential functions of her job. This, they argue, includes compliance with reasonable rules of SmithKline, including those against threatening peers and supervisors.   Conversely, Plaintiff's complaint alleges that she

was qualified to work as a security officer and qualified to perform other functions previously assigned to her by SmithKline.

First Circuit case law supports SmithKline's position.   "The ADA does not require that an employee whose unacceptable behavior threatens the safety of others be retained, even if the behavior stems from a mental disability." *Calef v. Gillette Co.,* 322 F.3d 75, 87 (1st Cir. 2003). Such an employee is not qualified. *Id.* That was the ruling in *EEOC v. Amego, Inc.,* 110 F.3d 135 (1st Cir.1997), and it is also the view of every other circuit case which has addressed a similar situation under the ADA or the Rehabilitation Act. *Id.* (citing *Palmer v. Circuit Court*, 117 F.3d 351 (7th Cir. 1997);   *Johnson v. New York Hosp.,* 96 F.3d 33 (2d Cir.1996); *Williams v. Widnall,* 79 F.3d 1003 (10th Cir.1996); *Crawford v. Runyon,* 79 F.3d 743 (8th Cir.1996): *See also Bercovitch v. Baldwin School, Inc.,* 133 F.3d 144, 154-55 (1st 1998) (plaintiff who cannot meet school disciplinary requirements is not otherwise qualified); *Adams v. Alderson,* 723 F.Supp. 1531, 1532 (D.D.C.1989), *aff'd* 1990 WL 45737 (D.C.Cir.1990) ("One who is unable to refrain from doing physical violence to the person of a supervisor, no matter how unfair he believes the supervision to be or

how provocative its manner, is simply not otherwise qualified for employment."); *cf. Reed v. LePage Bakeries, Inc.,* 244 F.3d 254, 262 (1st Cir. 2001) ("The ADA is not a license for insubordination in the workplace.")).

The facts before the Court are that on October 18, 2000, an incident occurred at SmithKline's lobby security post involving a discussion between Hernández and one of her coworkers Ana Castrodad wherein Hernández was considered to have acted disruptively. Hernández was later called to attend a meeting  with her supervisor Rivera and a SmithKline Human Resources Officer and at said meeting Hernández lost control and began shouting, accusing and physically threatening her supervisors.   After the meeting, Hernández who had an "emotional crisis"  and while at the SmithKline infirmary, expressed desire and willingness to kill Rivera and Cartagena.  It was after she engaged in this behavior that Hernández was terminated from her employment.

SmithKline has rules of conduct for the workplace.  The rules provide that employment will be terminated if on the company's premises an employee threatens and/or insults another employee. Hernández was aware of SmithKline's rules having received a copy of the rules of conduct in 1998.  The facts of this case and First Circuit case law point to the conclusion that due to her unacceptable work behavior Hernández is not a qualified individual under the ADA.

Even viewing the facts in the light most favorable to Hernández, the factual scenario does not support a conclusion that plaintiff is a qualified individual under the ADA.  Accordingly, it is **RECOMMENDED that the Motion for Summary Judgment as to the ADA claim be Granted**.

### 1.    Reasonable Accommodation

In the alternative, the Court addresses the issue of reasonable accommodation.  If Hernández was deemed to be a qualified individual with a disability within the meaning of the ADA, the ADA imposes upon the employer not only a prohibition against discrimination, but also, in appropriate circumstances, a positive obligation to make reasonable accommodation.  42 U.S.C. § 12112(a).  Absent disability of the employee, no obligations are triggered for the employer. *Soileau v. Guilford of Maine, Inc.*, 105 F.3d 12, 15 (1st Cir. 1997).  Failing to make a reasonable accommodation for a qualified individual, however, falls under the definition of discrimination. 42 U.S.C. § 12112(b)(5)(A).

Under the ADA the term "reasonable accommodation" may include:

> (A) Making existing facilities used by employees readily accessible to and usable by individuals with disabilities;
>
> (B) job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies . . . , and other similar accommodations for individuals with disabilities.

42 U.S.C. § 12111(9).

In order to prove the need for "reasonable accommodation," a plaintiff needs to show not only that the proposed accommodation would enable her to perform the essential functions of her job, but also that, at least on the face of things, it is feasible for the employer under the circumstances.  *Reed v. Lepage Bakeries, Inc.,* 244 F.3d 254, 259 (1st Cir. 2001).  If plaintiff succeeds in carrying this burden, the defendant then has the opportunity to show that the proposed accommodation is not as

feasible as it appears but rather that there are further costs to be considered, certain "devils in the details." *Id.*

The Complaint alleges that Hernández's employment was terminated in violation of the ADA, and further that SmithKline denied her reasonable accommodations to remain in her position even though there would have been no undue hardship.

It is undisputed that prior to the events of late October 2000, SmithKline accommodated Hernández's working needs. The record reflects that following Hernández's 1990 hospitalization for clinical depression, and upon her return to work SmithKline adjusted her work schedule because of her medication needs and it also adjusted or modified certain work duties; all for plaintiff's benefit. After that Hernández's supervisors did not change her straight shift or her job duties and she was kept on a modified schedule until the day she left her employment in November, 2000. The record further reflects that it was not until following the events of late October 2000, including her inappropriate work behavior in derogation of company rules, when Hernández's employment was terminated.

Defendants argue that the ADA does not require it to reasonably accommodate Hernández following her gross acts of insubordination and her threatening behavior. The undersigned agrees. "The ADA is not a license for insubordination at the workplace." *See Reed v. LePage Bakeries, Inc.,* 244 F.3d 254, 262 (1st Cir. 2001).

Hernández attempts to connect her discharge from employment to her depressive condition. Even if reasonable accommodations were pertinent, however, there is no reasonable accommodation which would have enabled Hernández to perform the essential functions of

her job   given her outbursts and threatening behavior.   Indeed,
SmithKline made appropriate accommodations upon Hernández's
request, yet they did not prevent her behavior in October 2000.

Accordingly, **Summary Judgment is RECOMMENDED as to this issue (reasonable accomodation)**.

A.      **Title VII Claim**

Plaintiff's complaint alleges that prior to her termination of
employment she was subjected to sexual harassment by her supervisor,
José Ramón Rivera, and that SmithKline was aware of the harassment.
She alleges this harassment caused her extreme mental trauma and
emotional distress.   The Defendants contend they are entitled to
summary judgment on Hernández's Title VII claim on the basis that
she failed to make a claim of a hostile work environment, she failed to
avail herself of the preventive and corrective measures provided by
Smith Kline's policy against sexual harassment and because several of
the claims are time barred.   The facts before the Court support
Defendants' position.

The Defendants argue that any allegations of sexual harassment
for conduct arising before January 8, 2000 are time barred.   We agree.
A plaintiff who brings a hostile work environment claim under Title
VII must file her claim within 300 days of an act of discrimination, and
in general cannot litigate claims based on conduct falling outside of
that period. *See Miller v. New Hampshire Dep't of Corrections,* 296 F.3d 18, 21-22
(2002).   The limitations period serves to "protect[ ] employers from the
burden of defending claims arising from employment decisions that are
long past" unless the Title VII violation is one of a "continuing nature.
*Thomas v. Eastman Kodak Co.,* 183 F.3d 38, 47 (1st Cir.1999) (quoting *Delaware*

*State Coll. v. Ricks,* 449 U.S. 250, 256-57 (1980)).

In this case it is not alleged that the claims are of a continuing nature and further the facts do not support such a conclusion. Therefore, the claims Hernández refers to in her deposition and in her claim before the Anti-Discrimination Unit that occurred before January 8, 2000, are barred by the limitation period for Title VII claims.

The Defendants assert that they are also entitled to summary judgment on the claims timely filed by Hernández. Title VII of the Civil Rights Act of 1964 prohibits employers from discriminating against an individual with respect to her employment on the basis of her sex. 42 U.S.C. § 2000e-2(a)(1). A Title VII sex discrimination claim may be proven with direct evidence of discrimination or it may be proven with circumstantial evidence. *Smith v. F. W. Morse & Co.*, 76 F.3d 413, 421 (1st Cir. 1996). During the summary judgment stage, unless a Title VII plaintiff has direct evidence of discriminatory motive on her employer's part, her access to a trial depends on her performance in the *McDonnell Douglas* burden-shifting contest. *Rodríguez-Cuervos v. Wal-Mart Stores, Inc.,* 181 F.3d 15, 19 (1st Cir. 1999); *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973).

''Although its exact contours remain somewhat murky, the term 'direct evidence' normally contemplates only those statements by a decisionmaker that directly reflect the alleged animus and bear squarely on the contested employment decision.'' *Vesprini v. Contract Flooring Services, Inc.,* 315 F.3d 37, 41 (1st Cir. 2002) (citations and internal punctuation omitted) (emphasis in original). The First Circuit notes that:

> The high threshold for this type of evidence requires that ''mere background noise'' and ''stray remarks'' be excluded

from its definition. A statement that can plausibly be interpreted two different ways--one discriminatory and the other benign--does not directly reflect illegal animus, and, thus, does not constitute direct evidence. Hence, direct evidence is relatively rare.

*Patten v. Wal-Mart Stores East, Inc.,* 300 F.3d 21, 25 (1st Cir. 2002) (citations and internal quotation marks omitted).

The First Circuit has also cautioned, however, that:

Comments which, fairly read, demonstrate that a decisionmaker made, or intended to make, employment decisions based on forbidden criteria constitute direct evidence of discrimination. The mere fact that a fertile mind can conjure up some innocent explanation for such a comment does not undermine its standing as direct evidence. To hold otherwise would be to narrow the definition so drastically as to render the *Price Waterhouse* [*i.e.,* mixed-motive] framework inaccessible to all but the bluntest of admissions. We prefer a more measured approach.

*Febres v. Challenger Caribbean Corp.,* 214 F.3d 57, 61 (1st Cir. 2000) (citations omitted).

Also, the temporal proximity between the remarks and the ensuing employment action speak to the reasonableness of an inference that a causal relationship existed between the remarks and the decision made. *Vesprini,* 315 F.3d at 41-42. Furthermore, the comments must unambiguously evince   sex-based animus, such that they are not reasonably susceptible to a benign connotation. *Id.; See González v. El Día, Inc.,* 304 F.3d 63, 70 (1st Cir. 2002).   Nonetheless, even if remarks are characterized as "stray remarks" same may properly constitute evidence of discriminatory intent to be considered in combination with other evidence.  *McMillan v. Massachusetts Soc'y for Prevention of Cruelty to Animals*, 140 F.3d 288, 300 (1st Cir. 1998).   During her deposition Hernández testified that she had concluded that she was a victim of sexual harassment based upon the following incidents, all of which occurred in the year 2000:  (A) Rivera said to her, "Yolanda put on a mini-skirt like Ana Castrodad to see your little thighs and Ojeda can take a peek

at you" (several workers were present, *Hernández dep. p. 148*); **(b)** Rivera entered the Control Area and sat on Ana Robles' thighs, (Hernández was not present when this occurred, but Rivera later jokingly told her about it while Ana Robles was present, *Hernández dep. pp. 152-53*); **(c)** Rivera commented that Castrodad was good looking and pretty (this made Hernández uncomfortable because that type of comment was constant, *Hernández dep. p. 157*); **(d)** Rivera commented first while alone with Hernández, and later in front of Griselle Guevara, that Guevara was very good looking and that what he had at home for his wife was a piece of junk (Hernández and Guevara both told Rivera he should not talk about his wife like that, *Hernández dep. pp. 161-162*); and, **(e)** Rivera told Hernández that Betsy Rodríguez obtained her position at SmithKline due to her personal relationship with José Luis Rosado, insinuating they had an affair. *Hernández dep. at pp. 145-147.* Hernández referred to the above as comments on "sexual subjects". *Id. at p. 165.*

Hernández's claim is one alleging a hostile work environment. The scope of Title VII's prohibition of discrimination "because of. . .sex" "is not limited to 'economic' or 'tangible' discrimination. The phrase 'terms, conditions, or privileges of employment' evinces a congressional intent to strike at the entire spectrum of disparate treatment of men and women in employment." *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 64 (1986) (citations and some internal quotation marks omitted). Thus, discrimination "because of ... sex" includes "requiring people to work in a discriminatorily hostile or abusive environment." *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21 (1993). "When the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's

employment and create an abusive working environment, Title VII is violated." *Id.* (citations and internal quotation marks omitted).

The Supreme Court has outlined the test a plaintiff must meet to succeed in a hostile work environment claim as follows:

> (1) that she is a member of a protected class; (2) that she was subjected to unwelcome sexual harassment; (3) that the harassment was based upon sex; (4) that the harassment was sufficiently severe or pervasive so as to alter the conditions of plaintiff's employment and create an abusive work environment; (5) that sexually objectionable conduct was both objectively and subjectively offensive, such that a reasonable person would find it hostile or abusive and the victim in fact did perceive it to be so; and (6) that some basis for employer liability has been established"

*O'Rourke v. City of Providence*, 235 F.3d 713, 728 (1st Cir. 2001) (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 787-89 (1998); *Harris v. Forklift Sys., Inc.*, 510 U.S. 17 (1993); *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 65-73 (1986).

The First Circuit has observed that while evidence of sexually-charged or salacious behavior is often sufficient, it is not necessary to the proof that a work environment was sufficiently hostile or abusive to a female employee to amount to discrimination on the basis of sex. *See O'Rourke,* 235 F.3d at 729 (noting that "sex-based harassment that is not overtly sexual is nonetheless actionable under Title VII"); *Lipsett v. University of Puerto Rico,* 864 F.2d 881, 905 (1st Cir. 1988) (stating that male employees' verbal attacks directed at female employees that were not sexual in nature but were "anti-female" could be found to contribute to hostile work environment); *see also Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 80 (1998) ("harassing conduct need not be motivated by sexual desire to support an inference of discrimination on the basis of sex."). Conduct that results from "genuine but innocuous differences in the ways men and women routinely interact with members of the same sex and of the opposite sex" does not violate Title VII. *Oncale,* 523 U.S. at 81. Thus, "offhand comments, and isolated incidents" are not

sufficient to create actionable harassment; the hostile work environment standard must be kept "sufficiently demanding to ensure that Title VII does not become a 'general civility code.'" *Faragher,* 524 U.S. at 788 (quoting *Oncale,* 523 U.S. at 81).

There must be proof that the work environment was so hostile or abusive, because of conduct based on one of the prohibited factors identified in Title VII, that the terms or conditions of the plaintiff's employment were caused to be altered. "Whether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances," which may include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris,* 510 U.S. at 23. Where a plaintiff endures harassing conduct, although not explicitly sexual in nature, which undermines her ability to succeed at her job, those acts should be considered along with overtly sexually abusive conduct in assessing a hostile work environment claim. *O'Rourke,* 235 F.3d at 729 (citation omitted). Courts should avoid disaggregating a hostile work environment claim, dividing conduct into instances of sexually oriented conduct and instances of unequal treatment, then discounting the latter category of conduct. *Id.*. Indeed, the Court is to consider the totality of circumstances in each case.

Case law supports a finding for Defendants on the issue of hostile work environment. While the comments made by Rivera are certainly in poor taste, they are not of the type or made with the frequency for a hostile work environment claim. The cases where courts have found

a hostile work environment are simply different in degree and kind from the facts in this case. *Compare Harris v. Forklift Systems,* 510 U.S. 17 (1993) (employee repeatedly insulted, made the target of sexual innuendo, denigrated); *Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57 (1986) (employee forcibly raped, repeated demands for sexual favors, fondled in front of other employees); *O'Rourke,* 235 F.3d 713 (1st Cir. 2001) (female firefighter hired under newly implemented affirmative action policy subjected to overtly sexual behavior, stacks of pornographic magazines, systematic and sustained exclusion and isolation, vandalism, discipline); *Hernández-Loring v. Universidad Metropolitana,* 233 F.3d 49 (1st Cir. 2000) (female faculty member pawed and lasciviously addressed by chancellor, repeatedly propositioned by head of academic committee); *White v. New Hampshire Dep't of Corrections,* 221 F.3d 254 (1st Cir. 2000) (daily, constant sexual references; explicit remarks and innuendo concerning plaintiff); *Danco, Inc. v. Wal-Mart Stores, Inc.,* 178 F.3d 8 (1st Cir.1999) (racial graffiti, physical threat; racial slur over three month interval); *Lipsett v. University of Puerto Rico,* 864 F.2d 881 (1st Cir.1988) (female medical resident subjected to three year period of ongoing sexual harassment, propositioning, and academic discipline) *to Paquin v. MBNA Mktg. Sys., Inc.,* 233 F.Supp.2d 58 (D.Me. 2002) (no prima facie case of hostile work environment sexual harassment through allegations that supervisor asked employee to perform "personal care" on him, commented to another representative that he would "eat" her, referred to customer named "Harry Dick," jokingly stated that her husband had called and wanted her to come home to watch pornographic movies with him, and displayed picture of naked man to her when the five separate incidents of supervisor's inappropriate behavior toward her

over span of approximately four months were not so physically threatening or humiliating as to unreasonably interfere with her job performance and fell well short of frequency required to amount to abusive working environment);  *Black v. Zaring Homes, Inc.,* 104 F.3d 822, 823-24 (6th Cir.1997) (conduct over a four-month period insufficiently severe or pervasive where conduct involved repeated sexual jokes; sexual comments made to plaintiff while looking at her in a sexually suggestive manner, laughing at plaintiff when she mentioned the name Dr. Paul Busam (pronounced ''bosom''); and telling plaintiff she was ''paid great money for a woman'').

Additionally, although Hernández felt that Rivera's behavior and comments were inappropriate and created an unpleasant working environment, four or five instances of inappropriate conduct fall well short of the frequency required to amount to an abusive working environment. *See e.g., Marrero v. Goya of P.R., Inc.,* 304 F.3d 7, 19 (1st Cir.2002) (finding hostile work environment where harassment was ''more or less constant'' from plaintiff's first day of work in April 1995, until she left in November 1996); *White v. New Hampshire Dep't of Corr.,* 221 F.3d 254, 260-61 (1st Cir. 2000) (finding hostile work environment where ''disgusting comments'' and conversations occurred ''everyday''); *Chamberlin v. 101 Realty, Inc.,* 915 F.2d 777, 783 (1st Cir.1990) (expressing doubt as to whether five sexual comments made over the course of a four to five week period constitutes harassment severe or pervasive.  In the case at bar Hernández complains of five incidents spanning an employment period from 1979 to 2000, with those five incidents occurring during the last year of her employment.

Even accepting  Hernández's version of the evidence in a light

most favorable to her, the comments she complains of simply do not rise to a level of harassment and pervasiveness necessary to sustain a hostile work environment cause of action.  It is

undisputed that Hernández is a member of a protected class. In terms of frequency, the record indicates that the comments Hernández refers to, numbered only in five and all occurred during the course of a long career, albeit in the last year of employment. None of the comments were overtly sexual.  None of the comments were physically threatening or referred to Hernández in a particularly demeaning manner.  Granted, the comments were in poor taste and could be considered offensive, but it is difficult to conclude that these were more than offensive utterances. Significantly, other than Hernández's allegations to the effect that Rivera's attitude affected her work, there is no showing these comments actually did interfere with Hernández's ability to perform her job. *Wills v. Brown Univ.,* 184 F.3d 20, 26 (1st Cir.1999) (noting "[b]roadly speaking, a hostile environment claim requires the victim to have been subject to harassment severe enough to compromise the victim's employment or educational opportunities. . .").   The conduct forming the basis for a hostile work environment claim must be "extreme to amount to a change in the terms and conditions of employment" *Faragher,* 524 U.S. at 788.  Finally, it is noted that the record does not support a finding that Rivera's comments had bearing on the employment decision to terminate Hernández.  Rather, the record reflects that Hernández was terminated because of her inappropriate work behavior and noncompliance with work rules and regulations, all of which, were known .

The behavior Hernández complains of cannot be considered so physically threatening or humiliating as to unreasonably interfere with her job performance.  More so, this Court cannot conclude there is sufficient evidence to support a finding of a hostile work environment.

The Defendants also raise the affirmative defense that Hernández did not complain to her superiors or  avail herself of the remedies provided by SmithKline to prevent harassment in the workplace.  In this regards, it is clear that an employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee.  *Reed v. MBNA Mktg. Sys., Inc*., 333 F.3d 27, 32 (1st Cir. 2003). When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence.  *Id.* (citing Fed. Rule. Civ. Proc. 8(c)).

The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. *Id.* While proof that an employer had promulgated an antiharassment policy with complaint procedure is not necessary in every instance as a matter of law, the need for a stated policy suitable to the employment circumstances may appropriately be addressed in any case when litigating the first element of the defense.  *Id*.  And while proof that an employee failed to fulfill the corresponding obligation of reasonable care to avoid harm is not limited to showing an unreasonable failure to

use any complaint procedure provided by the employer, a demonstration of such failure will normally suffice to satisfy the employer's burden under the second element of the defense. *Id.* No affirmative defense is available, however, when the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment. *Id.* (citations omitted.)

As previously discussed, the facts before the Court do not lead to the conclusion that Hernández's termination was a result of harassment by her supervisor, but rather that she was terminated as a result of her own behavior. Therefore, the Defendants are entitled to assert their affirmative defense. Hernández acknowledged that she was aware of SmithKline's policy and the procedures to follow when an employee believes they are being harassed, yet, she did not avail herself of the policy. She testified that on one occasion she attempted to speak to a Human Resources official, but that she was "cut off". This means that Hernández never addressed her complaints to the Human Resources Department. Indeed, the facts before the Court are that at no time did Hernández properly avail herself of the procedure to inform SmithKline of her concerns. More so, it is undisputed that Hernández did not use SmithKline's complaint mechanism. This failure suffices to satisfy's SmithKline's burden to show that Hernández unreasonably failed to take advantage of any preventive or corrective opportunities provided by SmithKline. What this means is that in addition to summary judgment being appropriate based on the fact that there was no hostile work environment, it also means that summary judgment is appropriate based upon the affirmative defense asserted by the

Defendants.

Therefore, **it is RECOMMENDED that the Defendants' Motion for Summary Judgment as to the issue of a hostile work environment brought pursuant to Title VII be GRANTED**.

### III.   Supplemental State Claims

As a general rule, where the district court dismisses the federal claims before trial, the court should dismiss the state law claims without prejudice. *United Mine Workers of Am. v. Gibbs,* 383 U.S. 715, 726 (1966); *Rodríguez v. Doral Mortgage Corp.,* 57 F.3d 1168, 1177 (1st Cir.1995). Here, the undersigned has recommended that summary judgment be granted in favor of the defendants as to all of the federal claims brought against them by Hernández. Therefore, there is no need to address the merits of the supplemental state claims raised. Accordingly, it is RECOMMENDED that any supplemental state claims, be dismissed, without prejudice.

### IV.   Conclusion

It is therefore RECOMMENDED that Defendants' Motion for Summary Judgment **(Docket No. 26)** be **GRANTED** as follows:

— that the Motion for Summary Judgment as to the ADA and Title VII claims brought against defendant José Ramón Rivera in his individual capacity be **GRANTED**, and the claims brought against him be **DISMISSED** with prejudice;

— that the Motion for Summary Judgment as to the ADA claim be **GRANTED**;

— that the Motion for Summary Judgment as to the Title VII claim be **GRANTED**; and

— that all supplemental state claims, be **DISMISSED**, without prejudice.

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B) and Rule 72(a) of the Local Rules of Court. Any

objections to the same must be specific and must be filed with the Clerk of Court **within ten (10) days** of notice.  Rule 72(d), Local Rules of Court; Fed. R. Civ. P. 72(b).  Failure to timely file specific objections to the Report and Recommendation waives the right to review by the District Court, and waives the right to appeal the District Court's order. *United States v. Valencia-Copete*, 792 F.2d 4, 6 (1st Cir. 1986); *Park Motor Mart, Inc. v. Ford Motor Co.*, 616 F.2d 603 (1st Cir. 1980).  The parties are advised that review of a Magistrate-Judge's Report and Recommendation by a District Judge does not necessarily confer entitlement as of right to a *de novo* hearing and does not permit consideration of issues not raised before the Magistrate-Judge.  *Paterson-Leitch v. Massachusetts Elec.*, 840 F.2d 985 (1st Cir. 1988).

     **SO RECOMMENDED**.

     At San Juan, Puerto Rico, on this 30th day of August, 2005.


                        **S/AIDA M. DELGADO-COLON**
                        **U.S. Magistrate-Judge**